**In the Matter of V.M.D.**

No. 04–96–00226–CV.

Court of Appeals of Texas, San Antonio.

May 27, 1998.

Juan Neri, III, Law Office of Juan Neri, III, Jose M. Guerrero, Law Offices of Jose M. Guerrero, San Antonio, for appellant.

Mary Beth Welsh, Asst. Criminal Dist. Atty., San Antonio, for appellee.

Before RICKHOFF and DUNCAN and ANGELINI, JJ.

## OPINION

ANGELINI, Justice.

V.M.D. appeals a judgment finding her to have engaged in delinquent conduct for committing capital murder. In six issues on appeal, V.M.D. contends that the evidence is legally and factually insufficient to support the finding and that the trial court erred in overruling her motion to suppress her written and oral statements, in refusing to charge the jury on lesser included offenses, and in refusing to admit evidence regarding the guilt of a third party. We affirm the judgment of the trial court.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 6, 1995, two year old Leticia Alicia Gutierrez, also known as Alice or Pequena, and five month old Timothy Gutierrez were found dead in their apartment at 138 East Magnolia in San Antonio, Texas. There was no apparent trauma to either child and the causes of death were unknown. At the time of the deaths, there were at least twelve people living in the two bedroom apartment: Kathleen Dalton; her four children, Victoria, Sara, Nicholas, and Kayla; her boyfriend, Jesse Rios; his sister, Lucy Valdez; her boyfriend, Rene Gutierrez; and their four children, Anthony, Junior, Alice, and Timothy. On occasion, Rene's step-father, Manuel Gonzalez and his two daughters, Becky and Eva, also lived in the apartment.

Ray Aguirre is a paramedic with the San Antonio Fire Department. He was dispatched to 138 East Magnolia on January 6, 1995, around 5:00 p.m. He arrived at the scene and found Jesse Rios at the door, telling him to hurry. Jesse was very distressed. Upon entering the house, Aguirre observed the infant, Timothy Gutierrez, lying on the couch. Aguirre and his partner examined Timothy and determined that he was obviously dead. When a body dies, lividity results, that is, all the blood goes to the lowest point in the body. In this case, the

blood had settled in Timothy's face, tongue and chest. Aguirre discovered that Timothy had been in the hospital the previous week for treatment of respiratory difficulty.

When Aguirre went to the ambulance to get a form, he met V.M.D. She told him that she had been with Timothy, patting his back, about two hours prior to the 911 call. The baby had been sleeping and she had noticed that the baby slept "hard." When Aguirre reentered the house, he learned that the body of a two year old child, Alicia Gutierrez, had been discovered in a bedroom. The child was lying face down on the bed, with lividity in her face and vomit aspiration on her mouth. She had no vital signs. Aguirre noticed a nick of blood on her tongue.

Vance Meade is also an EMS technician with the San Antonio Fire Department. He accompanied Aguirre to 138 East Magnolia on January 6, 1995. He confirmed that, when he and Aguirre arrived at the scene, Jesse Rios was in the front yard telling them to go inside the house. Meade found Timothy face-up on the sofa. Timothy's face, chest, and abdomen exhibited lividity. He concluded that Timothy was definitely dead and had been dead for at least an hour.

Approximately twenty-five minutes after they arrived, Meade remembers a male voice saying that someone else was dead. He went to the back bedroom and found Alice's body. It was also in lividity, indicating that she had been lying slightly on her side. He noticed a tiny speck of blood on her tongue.

Meade noted that Jesse Rios refused to come into the house. They had to ask Jesse for information regarding the children three times before he would answer. Meade noted that it was an unusual situation because none of the adults showed much emotion. Aguirre also noted that he was shocked at how no one but Jesse Rios demonstrated any emotion regarding the deaths. Aguirre and Meade had a hard time getting information from anyone at the scene.

Meade noted in his report that V.M.D. told him she had been watching T.V. and patting the baby on the back for about two hours before the 911 call was placed. She also stated that she had said to someone earlier in the day that the baby sleeps a lot. Meade does not recall V.M.D. being very emotional at the scene; however, she was helpful in giving information.

Police officer Miguel Juarez responded to a sudden death call at 138 East Magnolia on January 6, 1995. When he arrived at the scene, Jesse Rios and Kathleen Dalton were inside the house. V.M.D. was not in the house. The emergency medical technicians notified him that there were two dead children involved. He saw Timothy's body in the living room and Alice's body in the bedroom. He began to isolate witnesses so officers could get statements from them all. After Officer Juarez had been at the scene approximately 30 minutes, he saw V.M.D. on the porch outside the house with several small children. He was notified by another officer that V.M.D. had been at the house when the children were sleeping. Juarez spoke with V.M.D. and asked her what had happened. V.M.D. stated that she had put the children to sleep by patting them on their backs and then she watched T.V. V.M.D. showed no emotion while speaking with Juarez.

Officer Robert Ramos also testified that he responded to a call regarding the deaths of two infants at 138 East Magnolia on January 6, 1995. He helped secure the scene. When Ramos asked V.M.D. if she knew anything about what had happened, she told him that the children's parents had been gone for about three hours looking for a new apartment. She told Ramos that she had put the children to sleep and that they were alive when she put them to sleep. Ramos believed that, under the circumstances, V.M.D. was very unemotional. When the parents arrived at the scene, they became hysterical.

Detective Timothy Rupp was dispatched to 138 East Magnolia on January 6, 1995, based on an EMS report of two deaths under suspicious circumstances. He inspected the scene and noted that the house was filthy. He remembers that the parents of the deceased children returned home and approached the house with urgency. When the parents were told that the children were dead, they became hysterical.

Detective James Holguin was also dispatched to 138 East Magnolia on January 6, 1995. He began speaking with witnesses and officers at the scene. He took V.M.D. to the bedroom to get her shoes so she could be taken to the police station to be interviewed. She got her shoes, sat down and put them on. Holguin thought it strange that V.M.D. didn't take the shoes and put them on outside, since the dead child was still lying in the bedroom.

Holguin remembers that the parents of the children became hysterical when they returned home and discovered that their children were dead. Holguin transported them to the police station, and they cried during the trip. They repeatedly asked what had happened and if it was really true. Lucy, the mother of the children, threw up in the police car.

Detective Leslie Speiss was working at the police station on January 6, 1995. A group of people were brought in as witnesses in a case regarding the deaths of two children. He was asked to help interview them. He interviewed V.M.D. V.M.D. gave Speiss the following statement:

I want to say that today, Friday the 6th of January, I woke up about 11:00 in the morning. I got up and ate breakfast. After breakfast I started cleaning the house. Lucy, Rene, Timothy, Alice, Anthony, Kayla, me and Junior were all at the house. Timothy, Alice, Anthony, and Junior are all kids. Timothy, Alice and Junior are Rene and Lucy's children. Anthony is Lucy's son from another guy. Me, Lucy and Rene were cleaning and the kids were just wandering around, except Timothy, he was sleeping. Timothy was sleeping a lot today. Rene left, I don't know where he went. About an hour after Rene left Timothy woke up. He has had bronchitis for about two weeks. He was crying and fussy, so I put him back to sleep on the couch. He had a bottle before I put him to sleep. Lucy fixed it for him. Alice, Junior, Kayla, and Anthony were in the backyard playing. Timothy was asleep on his stomach. Jesse came home and Lucy left with her sister-in-law. After Lucy left, Alice started pouting and calling for her mommie, Lucy. I put her to bed in our

bedroom. She sleeps in the same bedroom with me. Then I went back to the living-room and started watching a movie on HBO called "Take This Job and Shove It." It was on channel 14. Timothy was still asleep on his stomach on the couch with us. During the movie, my mom came home. Me and Jesse were watching the movie. After the movie, I went to the bathroom and when I came out of the bathroom Jesse said, "Oh, Kathy, look at him." He was talking about Timothy. Timothy was all purple. I didn't see anything around his mouth. Jesse called 911. I told Jesse during the movie that Timothy was sleeping a lot. Jesse said that he knew. Timothy is usually a quiet baby and I didn't hear him make any noise during the movie. After the ambulance came, my mom went into the bedroom to check on Alice. I was outside when this happened. A couple of weeks ago Rene and Lucy were arguing and I heard Rene say that he would claim the kids. I heard Lucy say that she didn't want to be with Rene anymore. Lucy and Rene have been staying with us for about two months. Rene found out that Lucy had been going out with this guy named Adam and that's when they started fighting....

Detective Rupp returned to the police station from the scene and began to review the statements that had been given. The mother of the children had indicated that Alice was clothed when she left her, but the body was found wearing nothing but a diaper. Because V.M.D. appeared to be the last witness to see the children alive, Rupp decided to reinterview her in order to clear up these inconsistencies. V.M.D. confirmed that she had put the children to sleep—she had stayed with Alice in the bedroom until she went to sleep and she had rocked Timothy to sleep and then laid him down on the sofa. V.M.D. showed no emotion until asked if there could have been some kind of accident. At that point, she became teary-eyed.

Detective David Evans was also dispatched to 138 East Magnolia on January 6, 1995. He assessed the scene and canvassed the area. He also attended the autopsy of the children on January 7, 1995. That same day,

he returned to the scene in an attempt to reexamine witnesses. Kathleen and V.M.D. agreed to come back to the station for further questioning. He and Detective Gonzalez alternately interviewed Kathleen and V.M.D.

When Evans questioned V.M.D., she repeated her initial story. She said that Jesse had not hurt the children. When asked who she thought had hurt the children, she remained silent. She then told Evans that what had happened was an accident. She would not elaborate further. She began to cry. Getting no further in his questioning, Evans left the room.

Detective Daniel Gonzalez then questioned V.M.D. V.M.D. showed no emotion when the interview began. When asked if she knew what might have happened, she responded that she did not hurt the children. She was also very adamant that Jesse had not hurt the children. After further questioning, she eventually gave the following statement:

> I want to say yesterday after Lucy left I was trying to put Renee [Alice] to sleep. I call Renee Pequena. Pequena was fussing and calling for her mom as I was trying to put her to sleep. That made me mad that she kept getting up. Jesse was in the living room watching T.V. He wouldn't help me with Pequena. Timothy was on the couch asleep. When Pequena got up the second time, I took her back in the bedroom and I told her she would get some ice cream when her mom got home. Pequena said, "no" like she didn't believe and that's when she pulled my hair. I got mad at Pequena. She would not let go of my hair. Pequena was kind of whining and calling for her mom. Pequena's mom had been gone for a while. I put my hand on Pequena's mouth and was pushing a little bit. I kept going shhh to get Pequena to be quiet. I put my hand over Pequena's mouth for like five to ten minutes. She tried to bite my hand at first, but after I had my hand on her mouth for a while she quit fussing. After I let go of Pequena's mouth I laid her on the bed. Her eyes were closed. I left the room. I sat there and watched T.V. until my mom came home. I didn't have no problem with Timothy. I didn't have to put my hand over Timothy's mouth to get him to be quiet. Pequena was afraid of me. After my mom got home, I went to check on Pequena. I kind of woke her up and asked if she was o.k. and Pequena said she was o.k. Then I spit my gum out and went back to the living room. That was when Jesse checked on Timothy and my mom said call 911. After EMS was there, mom went to get Timothy's medicine and she checked on Pequena and said Pequena was dead. My mom said Pequena was whiter than she was. That was it. I didn't hurt Timothy. I did not mean to hurt Pequena. I have read this statement and it is the truth.

V.M.D. was very matter of fact when she gave the statement. As she was describing putting her hand over Alice's mouth, she demonstrated what she did by placing her hand over her own mouth. When Gonzalez brought Kathleen back into the room and V.M.D. repeated her story, Kathleen did not seem surprised. Kathleen asked V.M.D. if she was covering up for Jesse and V.M.D. said that she was not. Detective Harold Bellamy sat in on a portion of V.M.D.'s January 7, 1995, statement. He noted that V.M.D. said she felt better after giving the statement.

Lucy Valdez testified that she had been living with Kathleen Dalton for two and a half months at 138 East Magnolia. Kathleen and Jesse stayed in one bedroom, while Lucy, Rene and the eight children stayed in the other bedroom.

V.M.D. often helped Lucy with her children. On January 6, 1995, Lucy fixed a bottle for Timothy and asked V.M.D. to give it to him. Lucy then went outside to do laundry. When V.M.D. informed her that Timothy was asleep, Lucy sent V.M.D. on a 5–minute errand. When V.M.D. returned, Lucy went inside to talk with her. The baby was asleep on the couch. Lucy left the apartment at 3:30 to go sign a lease at a new apartment. She left with Rene and some of his family members. When she left, she checked on the sleeping baby and he was fine. Lucy remembers that Alice was crying because she wanted to go with them. One of Rene's family members put Alice in bed be-

fore they left. V.M.D. was not in charge of the children that day. Lucy had asked her brother, Jesse, to watch the children, and Jesse was on the couch when Lucy left.

While they were out, Rene's father received a page. He called the 138 East Magnolia apartment and was told by an EMS technician that they needed to return home quickly because the children were very ill. They returned home immediately. When Lucy arrived home, a neighbor informed her that Alice and Timothy were dead. She does not remember much more about that night.

According to Lucy, V.M.D. did not like Alice and always tried to scare her. Alice was afraid of V.M.D. and would cry every time V.M.D. would walk past her. Alice had cerebral palsy and was an ill-tempered child.

A letter which was written by Lucy to her mother was introduced into evidence. The letter was dated December 30, 1994, approximately one week before Alice and Timothy were found dead. The letter states, in part:

Anthony needs for me to kick his ass in[.] Jr. I'm gonna crush his skull to the wall. Just joking. He's just a little trouble maker. Alice is gonna be a bitch, I feel it already.

Lucy testified that she always talked and joked in such a manner with her mother and with Kathleen. She did not literally mean what she wrote.

Rene Gutierrez testified that Lucy Valdez is his common law wife. They had four children, Anthony, Alice, Junior, and Timothy. On January 6, 1995, he left with Lucy and other family members about 3:30 p.m. to go sign a lease for a new apartment. Alice wanted to go with them, but he would not let her come. He does not remember seeing Timothy before he left. The other children were playing in the yard. Timothy had recently had bronchitis and the other children had colds.

While they were out, Rene's step-father received a page and returned to tell the others that Timothy was sick. They rushed to finish their business and caught the first bus home. The bus was slow, so Rene and Lucy got off and caught a taxi back to the apartment. When they arrived at the apart-

ment, they were informed that Alice and Timothy were dead. Rene did not believe it. He and Lucy were transported to the police station.

Earlier on the day of January 6, 1995, Rene saw V.M.D. start a fire in the trash can. He put it out and asked her what she was doing. She told him she did not do it. Later, she closed her younger sister, Kayla, in a suitcase. When Rene released the little girl and asked V.M.D. what was wrong with her, she replied that Kayla was her sister and she could do anything she wanted. V.M.D. did not like Alice. She would often scare Alice with a scary mask. It would make Alice scream and tremble.

Manuel Gonzalez is Rene Gutierrez's stepfather. He went to 138 East Magnolia around 3:20 p.m. on January 6, 1995. He noticed Timothy asleep on the couch. He left with Rene, Lucy and his two daughters to go pay a deposit on Rene and Lucy's new apartment. As they left, he heard Lucy ask Jesse to take care of the kids. Alice was crying because she wanted to go with them.

On the bus to the new apartment, Manuel's pager went off twice. At the apartment office, it went off again. He went to use a payphone and retrieved his messages. There was a message from Kathleen. It said, "Manuel, please tell Lucy that Timothy is dead." He did not believe the message. He called the house and an EMS technician answered. The EMS technician told him to come home quickly because the baby was very sick. Manuel returned to the office and told Rene and Lucy. They all left the office quickly.

He remembers that Alice's loud crying bothered V.M.D. V.M.D. used to scare the children. He once saw V.M.D. put four month old Timothy in a full dirty clothes hamper head first.

Becky Gonzalez is the twelve year old half-sister of Rene Gutierrez. On January 6, 1995, she went to 138 East Magnolia with her sister and father. They were going to go with Lucy and Rene to get a new apartment. When they arrived at the house, V.M.D. was on the couch. Alice was in the back bedroom with Lucy. Alice was crying. As they were

leaving, Becky put Alice in bed. They went to the apartment complex, where her dad got a message saying Timothy was dead.

Becky has seen V.M.D. scare Alice with a mask. Alice would cry and start shaking. V.M.D. would continue to scare Alice after being told to stop.

Barbara Handlin was a property manager on January 6, 1995. She rented an apartment to Rene Gutierrez and Lucy Valdez that afternoon. They arrived at her office around 5:00 p.m. During their meeting, Rene's step-father received a page. He asked where a pay phone was and left to go use it. He returned and had a conversation with Rene in Spanish. They finished their business and left.

Jesse Rios is Lucy Valdez's brother and Kathleen Dalton's boyfriend. On January 6, 1995, he lived with Kathleen Dalton and her children at 138 East Magnolia. Lucy, Rene, and their children were also living there. Jesse was gone the morning of the sixth and returned home at about 3:00 in the afternoon. V.M.D. was at home, sitting on the couch. Timothy was lying on the couch next to V.M.D. Jesse thought Timothy was asleep. He noticed the other children were outside. He did not see Alice. Manuel came into the apartment with his two girls and they left with Lucy and Rene. He told Lucy he would watch the children. He does not think Lucy checked on Timothy before she left. Jesse sat on the couch with V.M.D. and began to watch a movie. He heard a child cry. V.M.D. got up quickly and said she would put it to sleep. V.M.D. came back very quickly and sat on the couch. Jesse got up for a while when Kathleen came home and then returned to the couch. He remembers V.M.D. patting the baby on the back and saying that the baby sleeps a lot. She said this several times during the course of the movie.

When the movie was over, Jesse and V.M.D. got up. Jesse picked up Timothy and realized something was wrong with him. The baby looked like a "skull." Jesse put Timothy back down on his stomach and called Kathleen. Kathleen told him to call 911, which he did. V.M.D. was in the room at this time, but did not say anything. Jesse

went outside to wait for EMS. He was very upset. A short while later, Kathleen found Alice's body in the back bedroom. Jesse believes that V.M.D. is a normal child. He also believes that his sister, Lucy, loved her children very much.

Kellis Parker was V.M.D.'s ten-year old neighbor. She often played with V.M.D. She and V.M.D. liked scary things. They liked to be "scared out of their wits." Kellis's godfather gave V.M.D. a skull for Christmas. V.M.D. named the skull Pequena, which was Alice's nickname. Kellis remembers telling investigators that V.M.D. named the skull Pequena because she wished Alice was dead, but, at trial, she insisted that V.M.D. named the skull Pequena because of its size.

Kellis remembers that V.M.D. often had to take care of all the kids at her house and that V.M.D. did not like it. V.M.D. did not like Lucy because Lucy was mean to her and made her take care of the children.

Kathleen Dalton is V.M.D.'s mother. She returned home from work on January 6, 1995, around 3:45 p.m. She noticed Jesse and V.M.D. watching T.V. Timothy appeared to be sleeping on the couch. She spoke to some of the other children outside. She did not see Alice, so she assumed she was asleep. She spent over an hour in the bedroom folding clothes. She could hear Jesse and V.M.D. watching T.V. and talking, but she could not see them.

Jesse yelled at her to come in the living room because something was wrong with Timothy. She checked on Timothy and he was obviously dead. She told Jesse to call 911. V.M.D. was standing beside the couch but did not say anything. Kathleen and Jesse were crying. She does not remember if V.M.D. was crying. Kathleen and Jesse attempted to locate Manuel's pager number so they could notify Lucy.

After the paramedics arrived, Kathleen told V.M.D. to take the other children outside. She does not remember where V.M.D. was after that. As things were calming down, she noticed the other children and missed Alice. She went into the back bedroom and found Alice on the bed. She could

tell something was wrong with Alice by her coloring. She called for the paramedics.

On January 7, 1995, Kathleen and V.M.D. were at 138 East Magnolia when the police came back. Kathleen had been told the night before that they would be needed for further questioning, so she agreed to go with them to the station for more interviewing. She was separated from V.M.D. while they were questioned. After Kathleen gave her statement, she was asked to go into the room where V.M.D. was. She was given V.M.D.'s statement and learned that V.M.D. had confessed to suffocating Alice. Kathleen testified that she and V.M.D. both became very upset.

In a previous statement, Kathleen stated that, on the way home from the station, V.M.D. told her she had put her hand over Alice's mouth and kept it there to keep Alice quiet. V.M.D. told Kathleen that she had kept her hand on Alice's mouth until Alice went to sleep. V.M.D. described the whistling noise coming from between her fingers as she held her hand over Alice's mouth. However, on cross-examination, Kathleen testified that V.M.D. told Kathleen that the detectives told her what to say in her statement, and that the statement was not true.

Kathleen testified that, after Lucy and her family moved in with Kathleen, V.M.D. became moody and began having behavioral problems. She complained about all of the children being there and getting into her things. Kathleen told an officer that she was concerned that V.M.D. expressed no emotion at the scene or later about the deaths of the children. However, on cross-examination, Kathleen testified that she did see V.M.D. cry at some point on the night of January 6, 1995, and that she seemed to be stunned or in shock later that night.

Kathleen noted that V.M.D. is a quiet child. V.M.D. did scare Alice with a Halloween mask, but everyone in the house used the mask to tease the children. Kathleen noted that Timothy was often put to sleep in a laundry basket, so it was not unusual that Manuel had seen V.M.D. put Timothy in a laundry basket. Kathleen felt V.M.D. had a normal life for a twelve year old. However, on redirect examination, Kathleen agreed with her previous statement that, even before this all happened, she thought V.M.D. needed psychiatric help. Kathleen gave two more statements to the police after they received V.M.D.'s confession. In one of them, she stated that she was afraid V.M.D. might hurt her other children.

Roy Salas lived next door to Kathleen Dalton and her family on January 6, 1995. He knew everyone living at 138 East Magnolia and would visit there three or four times a week. On January 6, 1995, he was visiting around 8:45 in the morning. Lucy and Rene were in bed. Jesse and Kathleen were gone. Lucy called to Salas to feed Timothy his bottle, which he did. He fed the other children who were there, as well. He left around 11:00 a.m. Lucy and Rene were still in bed when Salas left. V.M.D. was not in the house the entire time he was there.

Jackie White manages a laundromat close to 138 East Magnolia. He knows Lucy, Kathleen and V.M.D. On January 6, 1995, V.M.D. came into the laundromat around 12:00 p.m. to buy a pack of cigarettes for Lucy. He would not take her food stamps and told her to come back with cash. She returned around 2:30 or 3:00 with cash. V.M.D. had baby-sat his granddaughters before and they liked V.M.D. very much.

John Santos and his uncle, Robert Rodriguez, lived next door to Kathleen Dalton on East Magnolia. They knew everyone living at 138 East Magnolia. On January 6, 1995, Santos and Rodriguez were going into their own apartment as Jesse came out of his apartment screaming that Timothy was dead. Rodriguez is a certified nursing assistant. Santos and Rodriguez, went over to 138 East Magnolia to see if they could help. They saw Timothy lying face down on the sofa. Rodriguez approached the baby on the couch, and touched him. The baby was cold and stiff and his lips were blue. Rodriguez told Kathleen there was nothing he could do. Santos went to the police station to give a statement. He saw V.M.D. at the station. V.M.D. said she was not scared, nor did she appear nervous.

The next night, Rodriguez saw Kathleen and V.M.D. return home. He went over and

asked them what had happened at the police station. V.M.D. appeared upset and tired. Kathleen also appeared upset. Kathleen told him that V.M.D. had confessed. V.M.D. began to cry and repeatedly said, "I didn't do it." V.M.D. told Rodriguez that the police told her she had to confess or she would not see her family again.

Cheryl Flagmeier is employed by child protective services in the initial assessment department. When the police have information that children are at risk in a home, they are required to contact CPS. Flagmeier was assigned to the Dalton family in order to do an assessment. She arranged an appointment to speak with V.M.D. and her half-brother and sisters. She spoke with each child in the presence of their grandmother and an aunt on January 15, 1995.

V.M.D. told Flagmeier that, on January 6, 1995, Lucy laid Timothy down on the couch. After Lucy left with the others, V.M.D. attempted to put Alice to sleep, but Alice kept getting up. V.M.D. lied to Alice, telling her that if she would lie down, she would get an ice cream. Alice finally went to sleep. V.M.D. then went to watch T.V. with Jesse. She sat on the couch with Timothy. She kept patting Timothy's back and saying that the baby slept a lot. V.M.D. told Flagmeier that she did not know what happened to Timothy and Alice. While speaking with Cheryl, V.M.D. appeared nervous. She showed no emotion regarding the deaths and would not make eye contact.

Jan Garavaglia was the medical examiner in this case. She performed the autopsies of Alice Gutierrez and Timothy Gutierrez on January 7, 1995. She had no knowledge of any statements made by witnesses when the autopsies were performed.

Garavaglia described Alice as a dirty appearing child. She had crusted dirt on her body and lice in her hair. The lividity in her body indicated that the investigator found her after she had been dead approximately one to two hours. The doctor noted some vomitus in her mouth and also tears and abrasions on the inside portion of her upper lip corresponding with the edges of her teeth. With no other cause of death being present and no C.P.R. having been performed, the cuts indicate that "quite clearly this girl was suffocated." Alice had a slight infection in her lungs suggesting a cold or early asthma, but not enough to cause her death. All of Alice's toxicology tests came back negative. Garavaglia ruled the cause of Alice's death to be homicide due to suffocation

Garavaglia described Timothy as a well-developed four month old child. She noted no trauma on Timothy's body, observing that he has no teeth. She ruled the cause of death to be suffocation based upon circumstance, stating, "this baby has no natural disease, it is found dead at the same time his sister is found dead, about the same time.... I would say this is not a coincidence that this baby dying [sic] of natural disease at the same time his sister is being killed. I feel that both of these children were killed." She testified that the odds of one child in the same house being killed and another dying of natural causes within hours of one another are "astronomical."

Based on lividity patterns, Garavaglia believes Timothy died before Alice and within several hours of the investigation, sometime in the afternoon. She rules out accidental death in Timothy's case, first, because of the clear foul play in Alice's case, but, also, because there is no "blanching" around Timothy's nose and mouth that would be apparent if he accidently suffocated from being asleep on his stomach. Also, lividity reveals that he was placed on the sofa face down, not with his head turned to either side. Hospital records indicate that he was recently treated for a bronchial infection, but there was no evidence of it during autopsy. All of Timothy's toxicology reports came back negative.

According to Garavaglia, Sudden Infant Death Syndrome (S.I.D.S.) is virtually indistin-guishable from suffocation. Therefore, in determining cause of death, it is necessary to look to the circumstances surrounding the death. Part of the definition of S.I.D.S. is that the circumstances surrounding the death do not suggest any foul play or accident. Therefore, there is no way Garavaglia could call Timothy's death a S.I.D.S. death because the circumstances surrounding his death do not suggest a natural death.

Garavaglia also believes that there is no way someone could recklessly apply force to someone's mouth in a case like this. In this case, the airways were occluded for at least a minute. Therefore, she concludes that the suffocations were intentional.

Randall Frost is the deputy medical examiner for Lubbock County, Texas. He reviewed the autopsy reports on both Alice and Timothy Gutierrez and the corresponding photographs and slides. He does not disagree with the autopsy reports. He agrees that it is near impossible that one of these deaths was accidental. He agreed that the deaths were the result of intentional acts.

Following the presentation of the evidence, the jury returned a finding of true to three allegations of delinquent conduct by the commission of capital murder.

## ARGUMENT AND AUTHORITY

### A. Admission of Written and Oral Satements

 In her fifth and sixth issues on appeal, V.M.D. contends that the trial court erred in denying her motion to suppress her written and oral statements because they were illegally taken and because they were not given voluntarily. At a suppression hearing, the trial court is the sole trier of fact and may choose to believe or disbelieve any or all of a witness's testimony. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App. 1996). Our review is limited to whether the trial court properly applied the law to the facts. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App.1990). We should "afford almost total deference" to a trial court's rulings on application of law to fact questions, as well as determinations of historical facts, if the resolution of those ultimate questions turns on an evaluation of witness credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). Accordingly, the trial court's decision will be upheld absent a clear showing of abuse of discretion. *Villarreal*, 935 S.W.2d at 138; *Banda v. State*, 890 S.W.2d 42, 51 (Tex.Crim.App. 1994), *cert. denied*, 515 U.S. 1105, 115 S.Ct. 2253, 132 L.Ed.2d 260 (1995).

The evidence at the suppression hearing consisted of the following: Officer Robert Ramos arrived at 138 East Magnolia on January 6, 1995. He was notified that it might be a crime scene and was asked to secure the area. There were no suspects at all, so he was just trying to get witness statements. He spoke with V.M.D. for about 5 minutes at the scene. He did not read her her rights. He discovered that V.M.D. had been the last person to see the children alive. Officer Miguel Juarez isolated witnesses at the scene so that the officers could determine who was present when the children were found. He approached V.M.D. on the porch and asked her if she knew anything about what had happened to the children. She said they were fine when she put them to sleep.

Detective Leslie Speiss took V.M.D.'s first written statement. He did not read her her rights and he did not take her to the juvenile area because she was neither a suspect nor under arrest. Because of her age, Speiss asked V.M.D. questions to determine her maturity level. V.M.D. never asked to see her mother, to see an attorney, or to leave. Speiss made no promises and engaged in no coercion in obtaining V.M.D.'s statement. V.M.D. was not in custody, she was not placed in handcuffs, she was free to leave at any time. After she gave her statement, she left the office.

Detective Timothy Rupp spoke with V.M.D. again after Detective Speiss took her written statement. He spoke with V.M.D. along with officer Holguin for approximately 30–40 minutes. She was a witness, not a suspect. She was free to leave, she was not handcuffed, and she was not under arrest. During the questioning, V.M.D. never asked to leave or take a break. She did not ask for a lawyer or for her mother. She was not coerced or promised anything. After she spoke with Detective Rupp, she left the station.

Detective David Evans went back to 138 E. Magnolia on January 7, 1995, and asked V.M.D. and her mother if they would return to the station for further questioning. He asked both V.M.D. and her mother if they wanted drinks or snacks. They declined. Evans alternated questioning V.M.D. with

Detective Gonzalez. He did not read V.M.D. her rights because she was not under arrest or in custody. She could have left at any time. V.M.D. told Evans that the incident was an "accident" but would not give any further information. She said she did not know what happened, and began to cry. However, she never asked for a break, to go home, for her mother, or for an attorney. Evans did not promise V.M.D. anything and he did not coerce her in any way. He did not threaten her or put words in her mouth. He did not tell V.M.D. what he thought had happened, nor did he mention the autopsies to V.M.D.

Detective Daniel Gonzalez went back to the scene on January 7, 1995, with Detective Evans. V.M.D. and her mother agreed to return to the station, and followed the detectives to the station in their own car. When he questioned V.M.D., he did not read her her rights. During the questioning, V.M.D. never asked to take a break, to speak with her mother or with an attorney, to stop the questioning, or for anything else. She was free to leave at anytime. Gonzalez notified V.M.D. of the abrasions found on Alice's lips. He did not mention anything else regarding the deaths because the autopsies had not been completed. He told V.M.D. that the police believed someone had hurt the children and asked her if she knew anything about it. Gonzalez asked her to repeat her statement three or four times. He told her he did not believe her statement. She began to cry, saying she did not know what happened. Finally, she said it was an accident but had no further explanation. They took a break, and he asked her if she wanted anything to drink. She declined.

Gonzalez came back later and spoke with V.M.D. again. V.M.D. asked what would happen if she told. He assured her she was not under arrest and that she would go home. V.M.D. then admitted to suffocating Alice. She demonstrated placing her hand over the child's mouth. Her statement was printed. V.M.D. read it back, corrected a typographical error, agreed it was true and correct, and signed it. She was then left the station with her mother.

During questioning, Gonzalez did not raise his voice. He did not threaten or coerce V.M.D. and he made her no promises. He never told her he knew what happened nor did he suggest to her what might have happened. He never threatened her or her family, or suggest anything to her. V.M.D. was never handcuffed, restrained, or arrested. She was never in custody or placed under arrest. Gonzalez considered V.M.D. only a witness. Even after she gave her second statement, the focus of the investigation did not shift to V.M.D. because there was still another unexplained death, the autopsies had not been completed, and there were many other witnesses. V.M.D. was arrested several weeks after her statement was given.

V.M.D. testified regarding the events surrounding her statements. She only had a bowl of cereal to eat on the day of the incident. There was a lot of commotion at the scene. She was nervous, scared, and confused. She felt she had to talk to the officers there and that she could not leave. No officer read her her rights, told her she did not have to answer, or that she could go get her mother. She saw her mom being put in a police car, which scared her. She was escorted through the house to get her shoes, and then she was placed in a police car alone.

At the station, V.M.D. was again separated from her family members. She was not offered anything to eat or drink. She was given no warnings. She did not believe she could leave. She was hungry, nervous, scared, confused, and shocked. However, the officers she talked to were nice to her. After V.M.D. gave her statement, they took her home.

Officers returned to V.M.D.'s house the next day. V.M.D. had only had cereal and orange juice that day. V.M.D.'s mother agreed that she and V.M.D. would go back to the station to answer more questions. They went to the station in their own car. V.M.D. was separated from her mother at the station. Once at the station, she did not think she could leave. She was given no warnings and she did not know she could refuse to answer. She was scared and confused.

V.M.D. testified that Detective Gonzalez made her repeat her statement fifty times.

He kept telling her that her statement did not make sense. He told her there were bruises on Alice's lips and that he knew the deaths were not natural. He told V.M.D. that her family would be split up if someone did not confess. He said that he would arrest V.M.D.'s mother and Jesse and that V.M.D. would be put in foster care. He also promised V.M.D. that she would not be sent to juvenile detention if she told the truth. He told her he knew it was an accident and suggested that she put her hand over the children's mouths to get them to sleep. He demonstrated to her what he thought she did.

V.M.D. testified that Gonzalez was mean. He shouted at her and she began crying. She finally gave the statement because she felt that she had to. The statement was partially true and partially "made-up." V.M.D. followed Gonzalez's suggestions when she said she had put her hand over Alice's mouth. She did not do anything to hurt the children. She fabricated the statement because of the officers' threats.

V.M.D. signed the statement after reading it aloud. She was asked if she wanted her mother to come in, and she said she did. When her mother came in, V.M.D. repeated the story to her mother. She was not handcuffed or restrained. She was not placed under arrest. She left with her mother. V.M.D. eventually told her mother she had lied to the officers. When she was arrested a few weeks later, she told Gonzalez that the statement was untrue.

Frank Peredez is a clinical psychologist in San Antonio. He testified that a 12 year old is very susceptible to influence by adults, especially by authority figures such as police officers. He stated that a child who was not told she is free to leave, not told she could see her mother, and not allowed to take breaks is very susceptible to coercion.

After hearing this testimony, the trial court denied the motion to suppress, reasoning that V.M.D. was never under arrest, she was never restrained, she never made a request that was denied, and her mother was present with her at the police station.

**1. Custody**

■ Issues regarding a confession of a juvenile, though raised in a criminal forum, are controlled by the applicable provisions of the Family Code. *Griffin v. State,* 765 S.W.2d 422, 427 (Tex.Crim.App.1989). Section 51.09 of the family code governs the admission of statements by juveniles. *See generally* TEX. FAM.CODE ANN. § 51.09 (Vernon 1996). A juvenile's confession, if given pursuant to a custodial interrogation without benefit of the family code admonishments, cannot be admitted against him in a subsequent criminal trial, consistent with TEX. CODE CRIM. P. art. 38.23 (Vernon Supp.1994) and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See Comer v. State,* 776 S.W.2d 191, 194 (Tex.Crim.App.1989). However, the family code does not preclude the admission of a statement made by a child if the statement does not stem from custodial interrogation. *Melendez v. State,* 873 S.W.2d 723, 725 (Tex.App.—San Antonio 1994, no pet.).

■ Any interview of one suspected of a crime by a police officer will necessarily have coercive aspects to it, but will not necessarily be considered custodial. *Parra v. State,* 743 S.W.2d 281, 285 (Tex.App.—San Antonio 1987, pet. ref'd) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). Accordingly, being the focus of criminal investigation does not amount to being in custody. *Meek v. State,* 790 S.W.2d 618, 621 (Tex.Crim.App.1990). Rather, a person is considered in custody only if, based upon the objective circumstances, a reasonable person would believe she was restrained to the degree associated with a formal arrest. *Stansbury v. California,* 511 U.S. 318, 322–24, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Dowthitt v. State,* 931 S.W.2d 244, 254 (Tex.Crim.App.1996).

■ In this case, the officers had no probable cause to arrest V.M.D. on either January 6 or 7, 1995. In fact, the deaths had not been determined to be homicides at the time V.M.D.'s statements were taken. Each officer testified that their intent in questioning V.M.D. was to gather information about the case. Although V.M.D. was a key witness because she appeared to be the last person to

have contact with the children, no officer considered V.M.D. to be more than a witness. Further, V.M.D. was not the focus of the investigation even after she gave her statements. She came to the police station voluntarily, she was never handcuffed or otherwise restrained, and she left the station with her mother after she gave each statement. The totality of the evidence presented at the hearing on V.M.D.'s motion to suppress supports the trial court's finding that V.M.D.'s statements were not the result of custodial interrogation.

### 2. Voluntariness

Even in the absence of custody, due process may be violated by confessions that are not voluntarily given. *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex.Crim.App. 1996). A statement is not voluntary if there was "official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex.Crim.App.1995). In judging whether a juvenile confession is voluntary, the trial court must look to the totality of circumstances. *Darden v. State*, 629 S.W.2d 46, 51 (Tex.Crim.App.1982).

In the present case, it is uncontested that V.M.D. voluntarily went to the police station in order to give her written statements. V.M.D. does not contest the voluntariness of her oral statements at the scene nor of her first written statement. She claims, however, that her second written statement was coerced. She testified that, at the time the statement was taken, she was confused, tired, hungry, and scared. She also stated that she was forced to repeat her statement 500 times over the course of three hours. According to V.M.D., she was promised leniency in exchange for her confession and she was told that if she did not confess, she would not see her family again. She further stated that Detective Gonzalez suggested what she should say in her statement.

V.M.D.'s testimony is directly contradicted by Detective Gonzalez's testimony. Gonzalez adamantly denied threatening or otherwise coercing V.M.D. into a confession. He further denies suggesting how the crimes might have occurred or promising leniency in exchange for a confession. Instead, Gonzalez testified that V.M.D. freely and voluntarily gave her statement. She read it aloud, made corrections, and signed it. Immediately after giving her statement, she repeated it to her mother.

The determination of the voluntariness of a confession is in the trial court's discretion. *Monterrubio v. State*, 941 S.W.2d 322, 324 (Tex.App.—Corpus Christi 1997, no pet.). The trial court is the exclusive judge of the credibility of the witnesses as well as the weight to be afforded their testimony. *Barton v. State*, 605 S.W.2d 605, 607 (Tex. Crim.App.1980).

> [T]he trial court, who observes the demeanor and appearance of the witnesses, is in a better position to determine their credibility than the appellate court is by reading their testimony as it appears in the record. Therefore, an appellate court must view the record evidence and all reasonable inferences therefrom in the light most favorable to the trial court's ruling, and must sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case.

*Villarreal*, 935 S.W.2d at 138. In light of the conflicting testimony presented at the hearing on V.M.D.'s motion to suppress, we cannot say that the trial court abused its discretion in finding that V.M.D.'s second statement was voluntary.

Because the record supports the trial court's findings that V.M.D. was not in custody when she gave her statements and that the statements were given voluntarily, we must conclude that the trial court did not abuse its discretion in overruling V.M.D.'s motion to suppress and in admitting the statements into evidence. V.M.D.'s fifth and sixth issues on appeal are overruled.

### B. Sufficiency of the Evidence

In her first and second issues on appeal, V.M.D. challenges the sufficiency of the evidence to support a finding that she committed capital murder. In reviewing a legal sufficiency challenge, we view the entire body

of evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Williams v. State*, 937 S.W.2d 479, 482–83 (Tex.Crim.App.1996). In reviewing a challenge to the factual sufficiency of the evidence, we must view all the evidence without regard to whether the evidence is favorable to the State or the appellant. *See Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996). We consider all of the evidence equally, being appropriately deferential to the fact finder's determination. *Id.* at 133. Following such a review, we will set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* at 135.

The jury found that V.M.D. engaged in delinquent conduct by committing capital murder on three counts.[1] In order to prove capital murder under the petition in this case, the State had to show that V.M.D. intentionally or knowingly caused the deaths of Alice and Timothy Gutierrez. *See Rousseau v. State*, 855 S.W.2d 666, 673 (Tex.Crim. App.), *cert. denied*, 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993). V.M.D. contends that the fact that she placed her hand over Alice's mouth to keep her quiet so she would go to sleep does not support an intentional or knowing desire to kill Alice. She, therefore, claims that there is no evidence of the requisite intent regarding the death of Alice. As to Timothy, V.M.D. claims that there is no evidence that she did anything to Timothy other than pat him on the back. Accordingly, she argues that there is no evidence at all to support a finding that she killed Timothy. The evidence in this case is largely circumstantial. However, whether we are reviewing the legal or factual sufficiency of the evidence, both direct and circumstantial evidence are weighed equally. *See Geesa v. State*, 820 S.W.2d 154, 161 (Tex.

Crim.App.1991). In practice, circumstantial evidence often has equal or even greater probative value than direct evidence. *Brown v. State*, 911 S.W.2d 744, 745–46 (Tex.Crim. App.1995). The jury, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Barcenes v. State*, 940 S.W.2d 739, 744 (Tex.App.—San Antonio 1997, pet. ref'd). The jury is entitled to draw reasonable inferences from circumstantial evidence to ultimate facts. *See Kapuscinski v. State*, 878 S.W.2d 248, 249 (Tex.App.—San Antonio 1994, pet. ref'd).

Intent to kill is a question of fact to be determined by the jury. *See Robles v. State*, 664 S.W.2d 91, 94 (Tex.Crim.App. 1984); *Barcenes*, 940 S.W.2d at 744. A culpable mental state is almost always proven through circumstantial evidence. *Mouton v. State*, 923 S.W.2d 219, 223 (Tex.App.—Houston [14th Dist.] 1996, no pet.). Because mental culpability is of such a nature that it generally must be inferred by the circumstances under which death occurred, the trier of fact may infer intent from any facts in evidence which tend to prove existence of such intent, including the accused's acts, words, and conduct. *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex.Crim.App.1991), *cert. denied*, 504 U.S. 974, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992); *Beltran v. State*, 593 S.W.2d 688, 689 (Tex.Crim.App.1980).

The evidence in this case supports a finding that V.M.D. intended to kill both Alice and Timothy. The most incriminating evidence is V.M.D.'s January 7, 1995, statement, in which she admits to placing her hand over Alice's mouth for five to ten minutes. Such an act implies the specific intent to kill, unless it was done in such a way that death or serious bodily injury could not result. *See Godsey v. State*, 719 S.W.2d 578, 581 (Tex.Crim.App.1986). The act in this case was done out of anger and with such force that it resulted in tears in Alice's upper

---

1. In one allegation, the State alleged that V.M.D. murdered both Alice and Timothy Gutierrez in the course of the same criminal transaction in violation of Tex. Penal Code Ann. § 19.03(7) (Vernon 1994). In the second allegation, the State alleged that V.M.D. murdered Alice Gutier-
rez, a child under six, in violation of Tex. Penal Code Ann § 19.03(8) (Vernon 1994). And, in the third allegation, the State alleged that V.M.D. murdered Timothy Gutierrez, a child under six, also in violation of Tex. Penal Code Ann. § 19.03(8) (Vernon 1994).

lip. V.M.D.'s statement was corroborated by the autopsy report which had not been completed at the time the statement was made. Based on the autopsies, the medical examiner concluded that the deaths were intentional. Likewise, V.M.D.'s own expert witness also concluded that the deaths were intentional. The medical experts based their opinions, in large part, on the close proximity in time, place, and manner of the two deaths. They concluded that it is extremely unlikely that a situation would occur in which one child dies of intentional suffocation and another child died of accidental or natural suffocation within hours and feet of each other.

There was no evidence offered which would dispute the fact that V.M.D. was the last person to see either of these children alive. She consistently stated that she put both children to sleep shortly before they were discovered dead. Although, V.M.D. attempted to implicate the mother of the children in their deaths, the evidence strongly supports the fact that Lucy was away from the house when the deaths occurred. Although a letter was admitted into evidence in which Lucy says she is going to crush the skull of one of her children, the letter itself reflects that Lucy is "just joking," and the child mentioned in the letter is not either one of the victims in this case. The evidence clearly reflects that the living conditions of all of the children living at 138 East Magnolia were deplorable, and that the adults involved were irresponsible, if not neglectful, in regard to their children. However, no convincing evidence was presented that would persuade a reasonable juror that Lucy killed either Timothy or Alice.

The evidence does reflect that V.M.D. was often responsible for caring for at least seven children, a heavy burden for a twelve-year old child. V.M.D. was often frustrated with this responsibility and with her living conditions. Accordingly, she had demonstrated hostility toward the children and toward Lucy in the past. Finally, she showed little emotion regarding the deaths of Timothy and Alice, either at the scene or during the investigation.

The cumulative force of all the evidence in this case supports the jury's verdict. Based on this evidence, any rational trier of fact could have found beyond a reasonable doubt that V.M.D. intentionally or knowingly caused the deaths of Alice and Timothy Gutierrez. The verdict is not against the overwhelming weight of the evidence and is not manifestly unjust. V.M.D.'s first and second issues on appeal are overruled.

## C. Lesser Included Offenses

In her third issue on appeal, V.M.D. contends that the trial court erred in denying her request to instruct the jury on the lesser included offenses of involuntary manslaughter and criminally negligent homicide. The trial court submitted only a charge on capital murder.

 In determining whether to submit an instruction on a lesser included offense, the trial court must employ the two-step analysis set forth in *Royster v. State,* 622 S.W.2d 442 (Tex.Crim.App.1981). *See Bignall v. State,* 887 S.W.2d 21, 23 (Tex. Crim.App.1994); *Ross v. State,* 861 S.W.2d 870, 876 (Tex.Crim.App.1992). First, the lesser included offense must be within the proof necessary to establish the offense charged; and then, there must be some evidence in the record that would permit a rational jury to find that, if the defendant is guilty, she is guilty only of the lesser offense. *Rousseau v. State,* 855 S.W.2d 666, 672–73 (Tex.Crim.App.), *cert. denied,* 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993). In conducting the *Royster* analysis, we review all the evidence presented at trial. *Havard v. State,* 800 S.W.2d 195, 216 (Tex.Crim.App. 1989). The credibility of the evidence and whether it conflicts with other evidence is not to be considered. *Saunders v. State,* 840 S.W.2d 390, 391 (Tex.Crim.App.1992).

 Both involuntary manslaughter and criminally negligent homicide are lesser included offenses of capital murder. *Tompkins v. State,* 774 S.W.2d 195, 213 (Tex.Crim. App.1987), *aff'd,* 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989); *Burnett v. State,* 865 S.W.2d 223, 228 (Tex.App.—San Antonio 1993, pet. ref'd). Therefore, the issue before us is narrowed to whether there is any evidence that, if V.M.D. is guilty, she is guilty

only of involuntary manslaughter or criminally negligent homicide.

The only difference between capital murder and the requested lesser included offenses is the requisite culpable mental state. Capital murder requires intent or knowledge, involuntary manslaughter requires reckless action, and criminally negligent homicide requires criminal negligence. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1); 19.03(a) (Vernon 1994) (capital murder); TEX. PENAL CODE ANN. § 19.04(a) (Vernon 1994) (involuntary manslaughter); TEX. PENAL CODE ANN. § 19.05(a) (Vernon 1994) (criminally negligent homicide). A person acts recklessly when she is aware of the risk surrounding her conduct or the results thereof, but consciously disregards that risk. TEX. PENAL CODE ANN. § 6.03(c) (Vernon 1994). A person acts with criminal negligence when she ought to be aware of the risk surrounding her conduct or the result thereof. TEX. PENAL CODE ANN. § 6.03(d) (Vernon 1994).

■■■ V.M.D. argues that there is no evidence that she suffocated Timothy Gutierrez. She claims the only evidence presented regarding Timothy reflects that she patted him on the back. Accordingly, she argues that if patting Timothy on the back killed him, it was done recklessly. V.M.D.'s argument is illogical. The cause of Timothy's death was suffocation. V.M.D. never contested this. Because she denies suffocating Timothy, she is not entitled to a lesser included offense. "When a defendant denies the commission of the offense and, therefore, presents no evidence establishing commission of a lesser included offense, he is not entitled to a charge on the lesser offense." *Fraga v. State,* 940 S.W.2d 736, 738 (Tex.App.—San Antonio 1997, pet. ref'd) (citing *Hackbarth v. State,* 617 S.W.2d 944, 947 (Tex.Crim.App. 1981)).

■■■ As to Alice Gutierrez's death, the only evidence presented regarding culpable mental state was the expert testimony regarding cause of death and V.M.D.'s second statement. Both of the medical examiners testified that the autopsy revealed Alice was intentionally suffocated. V.M.D. told the police that she put her hand over Alice's mouth for five to ten minutes in order to keep her

quiet. She stated, "I did not mean to hurt [Alice]." V.M.D. contends that her statement of lack of intent entitles her to the submission of lesser included offenses.

V.M.D.'s claim that she did not intend to kill Alice raises an issue as to culpable mental state only if it is taken alone and out of context. A statement that a defendant did not intend to kill the victim cannot be plucked out of the record and examined in a vacuum. *Godsey v. State,* 719 S.W.2d 578, 584 (Tex.Crim.App.1986); *Burnett,* 865 S.W.2d at 230. A closer look at V.M.D.'s statement, reveals that, after V.M.D. put her hand over Alice's mouth, she laid her down and left the room. V.M.D. then states that she later returned to the bedroom, where she woke Alice up and asked her if she was okay. According to V.M.D., Alice replied that she was okay. V.M.D.'s statement does not, therefore, indicate that V.M.D. caused Alice's death by placing her hand over Alice's mouth. This is consistent with V.M.D.'s trial strategy whereby she denied suffocating Alice, and is tantamount to denying the commission of the offense. As noted above, where a defendant flatly denies the commission of the offense, he is not entitled to a charge on the lesser offense. *Fraga,* 940 S.W.2d at 738.

Because the record contains no evidence that V.M.D. was aware of, but ignored, a risk of death or even that she was unaware of a risk of death, the trial court did not err in denying V.M.D.'s requested instructions on involuntary manslaughter and criminally negligent homicide. V.M.D.'s third issue on appeal is overruled.

## D. Guilt of a Third Party

■■■ In her fourth issue on appeal, V.M.D. contends that the trial court erred in refusing to admit evidence of the guilt of a third party. Specifically, the trial court would not admit evidence that Lucy Valdez, the mother of the victims in this case, had another child die five years before the incident at issue. In this case, the admission or exclusion of evidence was within the trial court's discretion and will not be disturbed absent a clear abuse of discretion. *See J.C.*

*v. State*, 892 S.W.2d 87, 88 (Tex.App.—El Paso 1995, no writ). Accordingly, V.M.D. must show that the trial court's ruling was error and that the error was calculated to cause and probably did cause rendition of an improper judgment. *Id.*[2]

V.M.D. attempted to introduce evidence that, on January 1, 1990, in Big Spring, Texas, police officers responded to a report of a child suffocating. They arrived at the scene and found the one-month-old baby of Lucy Valdez dead. The case was investigated, and after the medical examiner reported that the baby had died of viral pneumonia, the death was ruled to be natural. However, V.M.D.'s medical expert, Dr. Frost, reviewed the autopsy report and disagreed with the conclusion. He testified that sudden infant death syndrome or an asphyxial death could not be excluded as a cause of death. He made this conclusion without benefit of the autopsy slides. He reviewed only the report. He also stated that he could not conclude whether the death was accidental or intentional, only that it could have been caused by asphyxia.

According to V.M.D., this evidence should have been admitted to demonstrate that Lucy Valdez, not V.M.D., committed the murders of Alice and Timothy Gutierrez. In *Erwin v. State*, 729 S.W.2d 709 (Tex.Crim. App.1987), the court of criminal appeals established an exception to the general rule that evidence of a third party's guilt is not admissible. "[W]hen evidence of a third party's guilt is offered by the defendant and the third party in question is a State's witness, the evidence is admissible if the guilt of the third party is inconsistent with the defendant's guilt and the facts show the third party was so situated that he might have committed the crime." *Erwin*, 729 S.W.2d at 716.

■ In this case, there is no evidence that Lucy was at 138 East Magnolia when Alice died. While there is a greater likelihood that Lucy was still at home when Timothy died, the evidence strongly supports a

finding that Lucy was away from home at the time of Timothy's death, as well. The medical examiner placed the time of Timothy's death at sometime in the afternoon on January 6, 1995. There was also testimony that Timothy had been dead between one and three hours when he was examined by the EMS technicians around 5:00 that afternoon. It is uncontested that Lucy was not at home from 3:30 that afternoon until after the children were found dead. Under these circumstances, the facts do not conclusively show that Lucy was physically present when the deaths occurred. Accordingly, V.M.D. failed to satisfy the second prong of the *Erwin* test.

Even where the *Erwin* test is satisfied, if the proffered evidence is "spurious or speculative," its exclusion is not erroneous. *Casterline v. State*, 736 S.W.2d 207, 211 (Tex. App.—Corpus Christi 1987, pet. ref'd) (citing *Jackson v. State*, 552 S.W.2d 798 (Tex.Crim. App.1976) and *Smith v. State*, 516 S.W.2d 415 (Tex.Crim.App.1974)); *see Contreras v. State*, 915 S.W.2d 510, 518 (Tex.App.—El Paso 1995, pet. ref'd) (noting rules of evidence ultimately govern admission of evidence). In *Casterline*, a capital murder defendant sought to introduce evidence that the victim and his wife had both been having extramarital affairs in an effort to prove that the wife had a motive to kill the victim. The court excluded the evidence, finding that the evidence did not connect the wife to a criminal offense. *Id.* at 212.

■ The holding in *Casterline* is instructive here. The evidence at issue does not connect Lucy Valdez to murder. In fact, V.M.D.'s expert could not conclude that Lucy's first baby was murdered. Even if the death could be ruled a murder, there is no evidence that it was committed by Lucy. Given the speculative and inconclusive nature of the proffered evidence, it is only probative of the fact that Lucy Valdez had a baby die five years before the deaths at issue. It, therefore, has no probative value in the present case. Accordingly, we cannot conclude that the trial court abused its discretion in

2. Because this case was tried prior to January, 1996, the civil standard in regard to the admission of evidence applies. *See* Act of May 25, 1985, 69th Leg., R.S., ch. 590, § 3, 1985 Tex. Gen. Laws 2222, 2223 (amended 1995) (current version at TEX. FAM.CODE ANN. § 54.03 (d) (Vernon 1996).

excluding the evidence. V.M.D.'s fourth issue on appeal is overruled.

The judgment of the trial court is affirmed.