**In the Matter of M.R.R., Jr., A Juvenile.**

**No. 04–97–00630–CV.**

Court of Appeals of Texas, San Antonio.

May 5, 1999.

Rehearing Overruled June 15, 1999.

Steven E. Fry, Law Offices of Steven E. Fry, Edward A. Bartolomei, Law Offices of Edward A. Bartolomei, John J. Fahle, Law Offices of John J. Fahle, San Antonio, for appellant.

Mary Beth Welsh, Asst. Criminal Dist. Atty., San Antonio, for appellee.

Sitting: PHIL HARDBERGER, Chief Justice, CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice.

## OPINION

Opinion by: CATHERINE STONE, Justice.

■ A jury found Michael Rodriguez Rubio, Jr. (hereinafter "M.R.R.") guilty of delinquent conduct for committing the offense of capital murder and assessed a determinate sentence of forty years imprisonment.[1] After a transfer hearing, M.R.R. was transferred to the Texas Department of Criminal Justice—Institutional Division. On appeal, M.R.R. raises seven points of error in which he complains about evidentiary rulings, charge error, the trial court's admonition not to "stare down" witnesses, and an incomplete record.[2] We overrule these complaints and affirm the trial court's judgment.

### FACTS

On January 30, 1994, M.R.R., a member of a local gang, learned that Manuel Romero, a member of a rival gang, was planning a drive-by shooting on his house. Armed with that information and a semi-automatic rifle, M.R.R. and fellow gang member, L.A.,[3] drove by the Romero residence, and fired five shots at the back of the house and two shots at the front of the house. M.R.R. was the shooter; L.A. was the driver. Raymundo Diaz, Romero's four-year old nephew, was fatally wounded by the second round of gunfire.

A few days later, M.R.R. confessed to a teacher and a teacher's aide that he was involved a drive-by shooting. The San Antonio police were called to M.R.R.'s school to investigate. Upon the invitation

---

1. This is M.R.R.'s second conviction for his participation in the drive-by shooting death of Raymundo Diaz. M.R.R.'s first conviction was reversed by this court and the cause was remanded for a new trial based on the trial court's failure to properly admonish M.R.R. pursuant to section 54.03 of the Family Code. *In re M.R.R.*, 929 S.W.2d 687 (Tex.App.—San Antonio 1996, no writ).

2. M.R.R. also raised two points of error relating to the trial court's failure to properly admonish him and his parent at the beginning of the adjudication hearing as required by section 54.03(b) of the Family Code. Specifically, M.R.R. pointed out that the trial court failed to explain to him the law relating to the admissibility of a juvenile record in the punishment phase of a subsequent criminal proceeding. M.R.R. argued that these errors, although raised for the first time on appeal, mandated reversal without a showing of harm. *See e.g., In re M.R.R.*, 929 S.W.2d 689; *In re A.L.S.*, 915 S.W.2d 114, 115 (Tex. App.—San Antonio 1996, no writ).

After the briefs in this case were filed, but prior to oral argument, the Texas Supreme Court clarified the law in this area. The Court determined that a juvenile, in a case governed by pre–1997 law, may complain for the first time on appeal about the trial court's failure to give certain admonishments, unless the juvenile expressly waived the statutory requirement. *In re C.O.S.*, 988 S.W.2d 760,

767–68 (Tex. 1999). The Court also determined that such error is not subject to reversal without a showing of harm. *See id.* at 767–68; *In re D.I.B.*, 988 S.W.2d 753, 754–55 (Tex. 1999). In light of these cases, at oral argument M.R.R. withdrew his points of error relating to the trial court's failure to fully admonish him. Notwithstanding counsel's concession, we note that the record in the instant case does not reveal harm from the trial court's error. There is no evidence, for example, that M.R.R. could and would have entered into a plea bargain with the State based on a lesser included offense if he had been properly warned of the potential use of his juvenile record. *See In re C.O.S.*, at 767–68. Further, the record indicates that M.R.R.'s mother was present when M.R.R. was admonished. The trial court was not required to direct its comments to the mother or ask her whether she understood the nature of the proceedings and the allegations. *See In re O.L.*, 834 S.W.2d 415, 420–21 (Tex.App.—Corpus Christi 1992, no writ).

3. M.R.R. and L.A. were tried jointly for capital murder. L.A. was also found guilty of the offense of capital murder. His conviction was affirmed by this court in a written opinion issued December 30, 1998. *See In re L.A.*, No. 04–97–00434–CV, 1998 WL 904294 (Tex. App.—San Antonio Dec.30, 1998, no writ) (not designated for publication).

of the investigating officers, M.R.R., along his mother, went to the police station to discuss the shooting. At the police station, M.R.R. confessed to be being the shooter.

### ADMISSION OF WRITTEN STATEMENT

In points of error three, four, and six, M.R.R. challenges the admissibility of his written statement. Under point of error three, M.R.R. asserts that the trial court erred in finding that his written statement had been freely and voluntarily given in the absence of *Miranda* warnings. In his fourth point of error, M.R.R. complains that his statement does not comply with section 51.09 of the Family Code. Finally, in his sixth point of error, M.R.R. argues that his statement was obtained in violation of sections 52.02 and 52.025 of the Family Code, requiring juveniles to be detained and processed in specifically designated facilities.

In response, the State argues that M.R.R. was not in custody at the time he gave his statement and that his statement was freely and voluntarily given. Because M.R.R.'s voluntary statement did not stem from custodial interrogation, the State thus contends that neither the lack of *Miranda* warnings nor non-compliance with sections 51.09 and 52.02 of the Family Code rendered M.R.R.'s statement inadmissible. The record supports the State's position.

■ Custodial interrogation is questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of his freedom in any significant way. *Cannon v. State*, 691 S.W.2d 664, 671 (Tex.Crim.App.1985), *cert. denied*, 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986). In determining whether an individual is in custody, a two-step analysis is employed. First, a court examines all the circumstances surrounding the interrogation to determine whether there was a formal arrest or restraint of freedom of movement to the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct.

1526, 128 L.Ed.2d 293 (1994). This initial determination focuses on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the individual being questioned. *Id.* at 323, 114 S.Ct. 1526. Second, a court considers in light of the given circumstances whether a reasonable person would have felt he or she was at liberty to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Traditionally, courts considered four factors in making this determination: (1) whether probable cause to arrest existed at the time of questioning; (2) subjective intent of the police; (3) focus of the investigation; and (4) subjective belief of the defendant. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex.Crim.App.1996). Under *Stansbury*, however, the subjective intent of both the police and the defendant are irrelevant except to the extent that they may be manifested in the words or actions of the investigating officials. *Id.* The custody determination is based entirely upon objective circumstances. *Id.* Stationhouse questioning does not, in and of itself, constitute custody. *Id.* at 255.

■ In the instant case, the police were called to Brentwood Middle School after M.R.R. confided to his teacher that he had participated in a drive-by shooting. School authorities notified the Edgewood Independent School District's police department and M.R.R.'s mother. M.R.R. was in the principal's office with his mother and Principal Marquez when Edgewood Officer Regina Reed arrived. Officer Reed and Edgewood Officer Pilar Mireles talked with Principal Marquez about M.R.R.'s confession and then contacted the San Antonio police department. Officers Reed and Mireles remained outside the principal's office until the San Antonio police arrived. Officer Reed testified that M.R.R. was not placed under arrest. Neither Officer Reed nor Officer Mireles questioned M.R.R. about his statement. Officer Reed testified that M.R.R. was free

to leave the principal's office to attend classes. But he was not free, consistent with school policy, to leave the campus during school hours. The door of the administration office is locked only from the outside.

Once at the school, Detectives Roland Casias and Larry Ripley first spoke to M.R.R.'s mother. They explained to her that they were investigating M.R.R.'s involvement in a drive-by shooting. She was informed that M.R.R. was not under arrest at that time, that she and M.R.R. were free to leave, and that they did not have to talk with any officers. The officers then asked whether she would go to the police station to discuss the shooting; she agreed to do so. Detective Casias then spoke with M.R.R., conveying the same information to him. M.R.R. also agreed to accompany the officers to the police station. During the ride, M.R.R. was not handcuffed or otherwise restrained. Detective Casias testified that the case was not discussed in the car.

Once at the police station, M.R.R. was taken into the office of Detective Moffitt, the supervising officer of the investigation. Detective Moffitt arrived within twenty minutes of M.R.R.'s arrival. Detective Moffitt reminded M.R.R. that he was not under arrest and would not be placed under arrest on that day regardless of what he told them. He was instructed that he was free to leave and was not obligated to give a statement. M.R.R. was also told that he could talk to his mother who was sitting in an adjacent office, at any time. Detective Moffitt testified that M.R.R. then told him he wanted to stay and tell them what had happened. M.R.R. told them he had been sick and unable to sleep since the shooting. Detective Casias testified that M.R.R. volunteered that admission; it was not in response to any direct questioning. M.R.R. never asked to see his mother nor indicated that he wished to discontinue the discussion. Detective Moffitt testified that M.R.R. was ashamed and asked that his mother not know of his participation in the shooting. M.R.R. then gave a four-page written statement wherein he confessed to being the shooter. Detective Moffitt described M.R.R. as forthcoming, polite, remorseful, and very upset. M.R.R.'s mother was also described as cooperative and concerned.

M.R.R. chiefly relies on *In re S.A.R.*, 931 S.W.2d 585 (Tex.App.—San Antonio 1996, writ denied), in support of his argument that he was in custody at the time he gave his written statement. There, this court determined that the following circumstances demonstrated S.A.R. was in custody at the time her statement was given: S.A.R. was taken to the police station in marked car, placed in a small office for questioning where she was informed that she was the primary suspect for attempted capital murder and capital murder. The record also revealed that S.A.R. was photographed and fingerprinted while at the station. *In re S.A.R.*, 931 at 587.

■ Several facts distinguish the instant case from *In re S.A.R.* First, M.R.R. agreed to go with the police to the stationhouse. If the circumstances show that the individual acts upon the invitation or request of the police and there are no threats, express or implied, that he will be forcibly taken, then that person is not in custody at that time. *See Chambers v. State*, 866 S.W.2d 9, 19 (Tex.Crim.App. 1993), *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994); *Dancy v. State*, 728 S.W.2d 772, 778–79 (Tex.Crim. App.), *cert. denied*, 484 U.S. 975, 108 S.Ct. 485, 98 L.Ed.2d 484 (1987). Second, M.R.R. was instructed several times that he was not under arrest and that he would not be placed under arrest on that day for any statement he gave, that he was free to leave with his mother, and that he was not obligated to talk with the police. Importantly, the record reflects that M.R.R. volunteered to stay at the station and tell the officers about his participation in the shooting.

Based on the objective circumstances of the encounter, a reasonable person would

have felt that he was at liberty to terminate the interview and leave. Although M.R.R. was a suspect at the time, he was told he was not under arrest, and he was not restrained. Based on these facts, we conclude that M.R.R. was not in custody when he gave his statement, and therefore non-compliance with sections 51.09 and 52.02 of the Family Code did not render inadmissible M.R.R.'s statement.

 The record also supports the conclusion that M.R.R.'s statement was voluntarily given. Even in the absence of custody, due process may be violated by confessions that are not voluntarily given. *In re V.M.D.*, 974 S.W.2d 332, 346 (Tex. App.—San Antonio 1998, pet. denied). A statement is not voluntary if there was "official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Id.* (quoting *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex.Crim.App. 1995)). Here, the record reflects that M.R.R. voluntarily went to the police station to give his statement. At the police station, M.R.R. was reminded that he was not obligated to talk. In response to that warning, M.R.R. indicated that he wished to make a statement in order to ease his guilt. Points of error three, four and six are overruled.

## ADMISSION OF CONFESSION

 M.R.R. next argues that the trial court abused its discretion in failing to sever the trial of M.R.R. and co-respondent L.A. when L.A.'s confession, which made reference to him, was offered into evidence. Despite M.R.R.'s attempt to frame this point of error in terms of a severance issue, the point of error, as briefed, concerns the constitutional error in admitting co-respondent L.A.'s improperly redacted confession. We will construe the point of error in light of the arguments and authorities actually presented.

At trial, the State read the confessions of M.R.R. and L.A. into evidence. L.A.'s confession contained two references to M.R.R., one indirect reference and one direct reference:

> He [the co-actor in the confession whose name had been redacted] drove to *his cousin Monica Rubio's* house by the washateria.

> \* \* \* \*

> I didn't tell Paul or Ernest anything about what *me and Michael* had just done.

The State concedes that the admission of L.A.'s confession was error, *see Bruton v. United States*, 391 U.S. 123, 135–36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (Sixth Amendment's Confrontation Clause forbids use, at joint trial, of non-testifying co-defendant's confession that implicates defendant), but it argues that such error was harmless in light of the admission of M.R.R.'s confession and ample corroborating testimony, which implicated M.R.R. in the drive-by shooting.

 "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In determining harm, the question is not whether the outcome was proper or whether there was overwhelming evidence of guilt, but rather whether the overwhelming evidence "dissipates the error's effect upon the jury's function in determining the facts so that it did not contribute to the verdict." *Harris v. State*, 790 S.W.2d 568, 587 ( Tex.Crim.App.1989). To accomplish this task, we consider the source and nature of the error, whether and to what extent the error was emphasized by the State, the collateral implications of the error, how much weight a juror would probably place on the error, and whether declaring the error harmless would encourage the State to repeat it. *Id.*

The source and the nature of the error was the introduction of L.A.'s improperly redacted confession. L.A.'s confession was read to the jury and it was again referred to during the State's closing argument. Prior to the statement's admission, however, the jury had already learned of M.R.R.'s involvement in the shooting through witness testimony. For example, Monica Rubio, M.R.R.'s cousin, testified that she was with M.R.R. and L.A. before the shooting when she learned of their plan. Following the shooting, M.R.R. told Monica that they had fired shots at the house. M.R.R. also confessed his involvement in the shooting to a classmate and a teacher's aide. Further, the jury learned from Detective Moffitt that M.R.R. voluntarily implicated himself in the shooting. Aside from that damaging testimony, it cannot be forgotten that M.R.R.'s confession was also introduced into evidence. The introduction of M.R.R.'s own confession will not alone cure the Confrontation Clause violation caused by the introduction of L.A.'s confession, but it is a factor to consider in determining harm. *See Cruz v. New York,* 481 U.S. 186, 192–93, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). Although it cannot be said that the jury did not place some weight on L.A.'s confession, considering the timing of the admission of L.A.'s statement coupled with the existence of other untainted damaging evidence, we cannot conclude that the jury would have reached a different result without the effects of the error. *See Harris,* 790 S.W.2d at 587 (error is harmless if evidence exists to dissipate error's impact). Further, in light of the State's candid concession of error, we do not believe that declaring the error harmless would encourage the State to repeat this error with impunity. *See id.* Point of error number five is overruled.

## LESSER INCLUDED OFFENSE

In point of error number seven, M.R.R. argues the trial court reversibly erred in refusing his request for a jury charge on attempted capital murder as a lesser-included offense of capital murder.

In determining whether a jury must be instructed concerning a lesser-included offense, a two-step analysis must be applied. *Rousseau v. State,* 855 S.W.2d 666, 672–73 (Tex.Crim.App.1993). First, the lesser-included offense must be included within the proof necessary to establish the offense charged. *Id.* at 672. Second, there must be some evidence in the record that would permit a jury rationally to find that, if the defendant is guilty, he is guilty of only the lesser offense. *Id.* at 673. With respect to the second step of this analysis, the Court of Criminal Appeals has instructed that:

> It is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense. Rather, there must be some evidence directly germane to a lesser-included offense for the factfinder to consider before an instruction on a lesser-included offense is warranted.

*Skinner v. State,* 956 S.W.2d 532, 543 (Tex. Crim.App.1997) (citing *Bignall v. State,* 887 S.W.2d 21, 24 (Tex.Crim.App.1994)).

The first step of our analysis is met; attempted capital murder is a lesser-include offense of capital murder. *See* TEX. CODE CRIM. PROC. ANN. art. 37.09(4) (Vernon 1981). The record, however, does not support the second step of our analysis. M.R.R. argues that his defensive theory that someone else fired the fatal gunshots entitled him to a such charge. We disagree. There is no direct evidence to support M.R.R.'s theory that an unidentified third-party shooter fired the fatal gunshots. Point of error number seven is overruled.

## INTIMIDATION ADMONITION

M.R.R. next argues that the trial court fundamentally erred by admonishing him not to "stare down" witnesses in violation of his Sixth Amendment right to confront witnesses—the right to look witnesses in the eye while they make their

accusations. This complaint, although of constitutional dimension, cannot be raised for the first time on appeal. *See* TEX. R.APP. P. 52(a); *Jenkins v. State,* 912 S.W.2d 793, 815 (Tex.Crim.App.1993) (opinion on reh'g). Even assuming this complaint had been properly preserved, M.R.R. has failed to demonstrate harm from this warning. There is no record support that the trial court's admonition caused M.R.R. not to look at witnesses, conveying a "tacit admission of guilt" to the jury. Point of error number eight is overruled.

### REPORTER'S RECORD

■ Lastly, M.R.R. argues he is entitled to a new trial because not all the bench conferences were recorded as required by section 54.09 of the Family Code. We agree that section 54.09 places a mandatory duty upon the court to record its judicial proceedings. *See* TEX. FAM. CODE. ANN. § 54.09 (Vernon 1996) (all judicial proceedings shall be recorded). We cannot agree, however, that M.R.R. was harmed by the non-compliance with section 54.09 in the instant case. Although numerous bench conferences were not recorded, M.R.R. has failed to demonstrate how those omissions in the record prevented him from presenting his arguments on appeal. In the absence of such proof, reversal on this point is not warranted. *See Moore v. State,* 999 S.W.2d 385, 398 (Tex. Crim.App.1999) (failure to record all bench conferences in violation of motion in limine did not require reversal where defendant failed to document in record that anything pertinent to appeal took place at unrecorded bench conferences); *see also S.S. v. State,* 879 S.W.2d 395, 397 (Tex.App.— Eastland 1994, no writ) (reversing for new trial because omissions in record prevented appellant from making proper presentation of case). Point of error number nine is overruled.

The judgment of the trial court is affirmed.