

# IN THE
# TENTH COURT OF APPEALS

## No. 10-09-00037-CV

## IN THE MATTER OF M.G., A JUVENILE,

**From the 272nd District Court
Brazos County, Texas
Trial Court No. 215-J-08**

## MEMORANDUM OPINION

A jury found that M.G. had engaged in delinquent conduct by committing the offense of aggravated sexual assault of a child, and the court placed him on probation for thirty-six months. In his sole issue, M.G. contends that the trial court erred in overruling his motion to suppress his videotaped statements. We will reverse and remand.

### BACKGROUND

M.G. filed a pretrial motion to suppress, requesting that the court suppress any of his statements that were the result of custodial interrogation because he had not been given the warnings required by the Fifth and Fourteenth Amendments to the United States Constitution; Article 1, Sections 9 and 10 of the Texas Constitution; articles 38.22

and 38.23 of the Code of Criminal Procedure; and section 51.095 of the Family Code. A hearing was held on the motion. M.G.'s mother and Bryan Police Department Detective Kelly Caldwell were the only witnesses who testified at the hearing.

M.G.'s mother testified that she called 911 because then eleven-year-old M.G. "confessed he had done these things" to her other son J.G. A detective subsequently contacted her and told her that she needed to take M.G. to Scotty's House.[1] Detective Caldwell testified that, after the initial part of the investigation, she asked M.G.'s mother if she would mind bringing M.G. to Scotty's House for a "juvenile victim interview" to see if M.G. had been a victim of any kind of abuse.

M.G.'s mother said she picked up M.G. from his Aunt Edna's house and told him that they were going to Scotty's House, "a place where they were going to help him." M.G. went with her willingly but, on the way there, he told her that his Aunt Edna had told him that "he didn't have to say anything to the F-ing police."

Once at Scotty's House, Nick Canto interviewed M.G. M.G.'s mother said she was not present during the interview and could not hear what was going on inside the interview room. However, Detective Caldwell was given the opportunity to listen in on the interview. She also had the ability to actively participate in the interview through an earphone and microphone, but she did not remember if she asked any questions. A video recording of the Scotty's House interview was admitted in evidence at the suppression hearing. During the interview, M.G. stated that he had told his mother that he sexually assaulted J.G. but that the truth was that he did not sexually assault J.G. and

---

[1] Detective Caldwell testified at trial that Scotty's House is the local child advocacy center where child victims are interviewed.

instead believed that his "stepdad" Rogelio[2] had done it. M.G. stated that he lied to his mother because Rogelio told him to, so Rogelio would not go to jail for it. The video also shows that Canto was given questions through the ear piece during the interview.

M.G.'s mother testified that, after the interview at Scotty's House, Detective Caldwell informed her that she had been listening in on the interview. Detective Caldwell told her that she *had* to take M.G. to the Bryan Police Department for questioning. Detective Caldwell said, however, that, after the Scotty's House interview, she *asked* M.G.'s mother if she would mind bringing M.G. over to the police department so that she could talk to him about what he had done to J.G. Detective Caldwell stated that M.G.'s mother was "more than willing" and that she said, "Yeah, that would be fine." Detective Caldwell further testified that although she saw M.G. at Scotty's House, and although he probably saw her, she never talked to him directly until they were at the police department.

M.G. and his mother went immediately from Scotty's House to the Bryan Police Department. M.G.'s mother said that when she and M.G. got into the car, she told him, "We are going to the police department." M.G. replied, "What are you doing? Where are we going?" She replied, "We're going to the police department." M.G. said, "What? What? No, they're going to arrest me." She replied, "No they're just going to ask you questions. They want to help you." M.G.'s mother further testified that when they arrived at the police department, M.G. did not want her to park the car. He said,

---

[2] M.G.'s mother testified at trial that Rogelio was her live-in boyfriend during that time.

"No, no, no, they're going to arrest me." But he eventually went willingly with her into the police department and was cooperative with all the people there.

Detective Caldwell said that when she arrived at the police station, she removed her sidearm and then went out to the lobby to talk to M.G. and his mother. She asked M.G. if he would mind "coming back and talking to me," and M.G. responded, "Okay." M.G.'s mother said that Detective Caldwell asked her if it was "okay" to take M.G. and ask him some questions, and she said it was okay. M.G.'s mother stated that Detective Caldwell never represented whether M.G. was in custody.

M.G.'s mother testified that Detective Caldwell then took her to the crime victims' coordinator's office where she stayed during at least the first part of M.G.'s interview. Detective Caldwell said that, at some point, she told M.G.'s mother that she could be in the interview room with M.G. but that Caldwell felt like M.G. would not be as honest. As Detective Caldwell was showing M.G. to the interview room, M.G.'s mother was following and then stopped to talk to the crime victims' coordinator. M.G. saw this, and Detective Caldwell told him that his mother "was going to talk to someone up here while we went back to the other room and talked." M.G. had no reaction, and she did not remember if she ever asked M.G. if he wanted his mother in the room for the interview.

Detective Caldwell and M.G. had to walk through the detectives' area to get to the interview room. She stated that she did not know if any firearms were exhibited in that area, but if an officer had been sitting at his or her desk, then he or she would more than likely have been wearing a sidearm. She also stated that M.G. did not have to pass

any jail cells on his way to the interview room, he was not wearing handcuffs, and she was not wearing a badge. M.G.'s mother testified, however, that although she did not remember whether Detective Caldwell was wearing a weapon that day, she did remember Detective Caldwell wearing a badge. The video recording of the interview shows that Caldwell did have some type of badge or identification around her neck.

Detective Caldwell described the interview room as a small room with a table and two chairs. The only thing on the wall was a two-way mirror. Although there was a lock on the door, she never locked it, but she did close the door, even when she left the room and left M.G. alone.

Regarding the interview itself, Detective Caldwell stated that she usually tells a person that she is recording the interview, but she did not remember if she told that to M.G. Although she testified that she never told M.G. that he was under arrest or that he was detained, she did not remember if she ever told him that he was *not* under arrest or detained. She never read M.G. *Miranda* warnings. She said she usually tells the person that he or she is free to leave, and she thought that she might have in this case, but she was not certain and could not testify affirmatively that she told M.G. that he was free to leave. On the video recording of the interview that was admitted in evidence at the suppression hearing, Detective Caldwell never told M.G. he could leave.

Once the interview actually began, Detective Caldwell asked M.G. what he was there to talk about, and he replied that he was there to talk about his stepdad touching his little brother. Detective Caldwell responded that they were there instead to discuss what *he* had done to his little brother. M.G. initially denied doing anything to his

brother. Detective Caldwell then used several interrogation techniques on the eleven-year-old. She asked M.G. what he thought her job was, and he replied "to arrest people." Detective Caldwell agreed but told him that part of her job was also to help children and that she wanted to get him and his little brother the help that they needed. She told him that she had watched the earlier Scotty's House interview and that she knew he was not being completely honest. She confronted him regarding his confession to his mother and J.G.'s identification of him as the perpetrator. She also told him that they had recovered evidence, including a shirt, from his bedroom and that, if he had sexually assaulted his brother, they would find both his and his brother's DNA on the shirt. During this time, M.G. cried some, but he continued to deny sexually assaulting his brother. Detective Caldwell then left the interview room and told M.G. that she would give him a few minutes to think about it.

After approximately sixteen minutes alone in the interrogation room, Detective Caldwell then returned to the room with M.G.'s mother. Detective Caldwell asked M.G.'s mother to sign a consent form, allowing Detective Caldwell to take DNA cheek swabs from M.G. M.G. signed the paper as well. Detective Caldwell took the cheek swabs and told M.G.'s mother that she could leave the interview room, which she did. Detective Caldwell then told M.G. that they would be able to use the swabs to see if his DNA was mixed with his brother's DNA on the shirt that they had taken from his bedroom. A short time after this, M.G. began to inculpate himself and ultimately confessed that he sexually assaulted his brother.

M.G.'s mother testified that she and M.G. left together after the interview. Although she stated that she felt that they could have left the police station anytime, she had never expressed that to M.G. She acknowledged that M.G. had been dependent upon her that day because she was his ride.

The trial court overruled M.G.'s motion to suppress, and the relevant portions of Detective Caldwell's interview were admitted at trial.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress evidence in a juvenile proceeding under a bifurcated standard of review. *See In re R.J.H.*, 79 S.W.3d 1, 6-7 (Tex. 2002); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give almost total deference to the trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002); *Best v. State*, 118 S.W.3d 857, 861-62 (Tex. App.—Fort Worth 2003, no pet.). However, we review *de novo* a trial court's rulings on application-of-law-to-fact questions that do not turn on the credibility and demeanor of witnesses. *Johnson*, 68 S.W.3d at 652-53.

## DISCUSSION

M.G. contends that the trial court erred in overruling his motion to suppress his videotaped statements because the statements were the result of custodial interrogation, yet he had not been advised of his rights, which violated the Fifth and Fourteenth Amendments to the United States Constitution; Article 1, Sections 9 and 10 of the Texas Constitution; and section 51.095 of the Texas Family Code. In response, the State

acknowledges that M.G. was not given the statutory warnings required by Texas Family Code section 51.095 but contends that the statements were nevertheless admissible because they did not arise from custodial interrogation. *See* TEX. FAM. CODE ANN. § 51.095(b)(1), (d) (Vernon 2009). Alternatively, the State argues that any error in admitting M.G.'s videotaped statements before the jury was harmless.

**Custodial Interrogation**

"Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). In cases involving adults, "[a] person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing *Stansbury v. California*, 511 U.S. 318, 322-25, 114 S.Ct. 1528, 1528-30, 128 L.Ed.2d 293, 298-99 (1994)). When the person involved is a minor, the court's inquiry is whether, based on the objective circumstances, a reasonable child of the same age would believe his freedom of movement was significantly restricted. *In re D.A.R.*, 73 S.W.3d 505, 510 (Tex. App.—El Paso 2002, no pet.); *In re L.M.*, 993 S.W.2d 276, 289 (Tex. App.—Austin 1999, pet. denied).

The Court of Criminal Appeals has recognized four factors relevant to determining custody: (1) probable cause to arrest, (2) subjective intent of the police, (3) focus of the investigation, and (4) subjective belief of the defendant. *Dowthitt*, 931

S.W.2d at 254. However, "factors two and four have become irrelevant except to the extent that they may be manifested in the words or actions of law enforcement officials; the custody determination is based entirely upon objective circumstances." *Id.*

Station-house questioning does not, in and of itself, constitute custody. *Id.* at 255. The following four general situations may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Id.* Concerning the first three situations, the restriction on freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. *Id.* Concerning the fourth situation, the officers' knowledge of probable cause must be manifested to the suspect. *Id.* Such manifestation could occur if information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers. *Id.* Custody is thus established in the fourth situation if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *Id.*

When the circumstances show that the individual acts upon the invitation or request of the police and there are no threats, express or implied, that he will be forcibly taken, then that person is not in custody at that time. *Dancy v. State*, 728 S.W.2d 772,

778-79 (Tex. Crim. App. 1987); *In re M.R.R.*, 2 S.W.3d 319, 324 (Tex. App.—San Antonio 1999, no pet.). However, the mere fact that an interrogation begins as non-custodial does not prevent it from later becoming custodial; police conduct during the encounter may cause a consensual inquiry to escalate into custodial interrogation. *Dowthitt*, 931 S.W.2d at 255.

Detective Caldwell had asked M.G.'s mother, who is also the mother of the alleged victim, if she would mind bringing M.G. to Scotty's House and then from Scotty's House to the police department. But Detective Caldwell never directly asked M.G. whether he was willing to talk to her until he was already at the police department. At that time, M.G. had just finished being interviewed at Scotty's House. Furthermore, once M.G. was at the police department and agreed to talk to Detective Caldwell, at Detective Caldwell's suggestion, he was isolated from his mother and then led through the detectives' area to an interview room, where he sat alone with Caldwell. The room was small. Detective Caldwell sat very close to M.G. while questioning him and appeared to be, at least in part, between M.G. and the door. Detective Caldwell never informed him of any of his rights under the Texas Family Code, and she was not sure if she told him that he was free to leave. Instead, Detective Caldwell made it clear that M.G. was the focus of the investigation involving the sexual assault of his brother. Despite M.G.'s denials, Detective Caldwell repeatedly asked M.G. if he had sexually assaulted his brother. At some point, M.G. became teary-eyed. Nevertheless, Detective Caldwell continued to press him for truthful statements, telling him that she knew that he was not being completely honest during the Scotty's House

interview. She also stressed to him several times that they had found a shirt in his bedroom with potential DNA evidence on it and brought his mother into the interview room, not for M.G.'s benefit, but only to allow Detective Caldwell to take DNA cheek swabs from him. After all this, M.G. finally gave a statement inculpating himself in the sexual assault.

Based on the circumstances outlined above, we conclude that a reasonable eleven-year-old child would have believed that his freedom of movement had been significantly restricted at some point after Detective Caldwell began to press M.G. for a truthful statement. *See Jeffley v. State*, 38 S.W.3d 847, 856-58 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (consensual non-custodial questioning of fifteen-year-old who had willingly accompanied detective to the police station escalated into custodial interrogation after police officer began pressing her for truthful statement; the eighth-grader sat alone, without parent or lawyer present or accessible, in police station with police officer who never informed her she was free to leave, never informed her of her rights under Family Code, and never made arrangements for her to return home, as promised); *L.M.*, 993 S.W.2d at 290-91 (eleven-year-old was in custody when she made her statements even though she was informed at beginning of interview of her right to remain silent, right to attorney, and right to terminate interview; interview was conducted in children's shelter where she was temporarily staying, she was not told she was free to leave interview room or children's shelter, she was isolated and alone during interrogation, and she was focus of investigation).

**Harm**

We consider next whether the trial court's error was harmful under Texas Rule of Appellate Procedure 44.2, which governs error in criminal cases. *See* TEX. R. APP. P. 44.2. Under Rule 44.2, the nature of the error controls the standard under which it will be evaluated. *See id.; Jeffley*, 38 S.W.3d at 858. Constitutional error requires reversal of a judgment of conviction or punishment unless the reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a). If the error is non-constitutional, it must be disregarded unless it affects substantial rights. TEX. R. APP. P. 44.2(b). The improper admission of a statement in response to custodial interrogation implicates the constitutional right against self-incrimination; therefore, we employ the harm analysis mandated by Rule 44.2(a). *D.A.R.*, 73 S.W.3d at 513; *Jeffley*, 38 S.W.3d at 858; *see* TEX. R. APP. P. 44.2(a).

The State argues that any error in admitting M.G.'s videotaped statements before the jury was harmless because the jury had already heard M.G.'s mother testify, without objection, that M.G. admitted to her that he had assaulted his brother J.G. However, M.G.'s mother also testified that, on several separate occasions, J.G. said that "Daddy" had touched him inappropriately. Although she explained this by stating that M.G. told her that he would tell J.G. that he was "Daddy," Rogelio testified that J.G. called him "Daddy" and that he had been alone with J.G. for approximately one hour every weekday afternoon. M.G.'s mother also testified that Rogelio continued to live in the house even after J.G. first accused him. Moreover, during its closing argument, the

State emphasized M.G.'s videotaped confession.  Thus, we cannot conclude beyond a reasonable doubt that the error did not contribute to M.G.'s conviction.

We sustain M.G.'s sole point.

## CONCLUSION

We reverse the judgment of the trial court and remand for further proceedings.


REX D. DAVIS
Justice

Before Chief Justice Gray,
        Justice Reyna, and
        Justice Davis
Reversed and remanded
Opinion delivered and filed August 11, 2010
[CV06]